IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 8, 2026

## TONY VON CARRUTHERS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 94-02797, 94-02798, 94-02799, 95-11128, 95-11129, P-25948   Carlyn L. Addison,**
**Judge**

————————————————————

**No. W2026-00226-CCA-R3-PD**

————————————————————

For events in 1994, a Shelby County jury convicted the Petitioner, Tony Von Carruthers, of three counts of first degree murder, three counts of especially aggravated kidnapping, and one count of especially aggravated robbery.  The Petitioner unsuccessfully appealed his convictions, as well as filed for post-conviction relief, Federal habeas corpus relief, and motions to reopen.  As relevant here, in 2021, the Petitioner filed a petition pursuant to the Post-Conviction Fingerprint Analysis Act of 2021.  He sought fingerprint analysis comparison of prints taken from the home of two of the murder victims and known latent prints of Ronnie Irving, a man implicated in these murders by co-defendant James Montgomery in 2010.  The post-conviction court summarily dismissed the petition after concluding that the Petitioner was not entitled to mandatory or discretionary testing.  On appeal, the Petitioner contends that the post-conviction court erred when it denied his petition.  After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court**
**Affirmed**

ROBERT W. WEDEMEYER, P.J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, J., joined and JOHN W. CAMPBELL, SR., J., not participating.

Amy D. Harwell, First Assistant Federal Public Defender and Marshall Jensen, Assistant Federal Public Defender, Nashville, Tennessee, for the appellant, Tony Von Carruthers.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin L. Barker, (on appeal) Assistant Attorney General; Courtney Orr, and Kirby May (at hearing), Assistant Attorneys General; Stephen J. Mulroy, District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

The Petitioner and his co-defendants, James Montgomery and Jonathan Montgomery[1], were each indicted for three counts of the first degree premeditated murders of Marcellos Anderson, his mother, Delois Anderson, and Frederick Tucker. Both James Montgomery and the Petitioner were also indicted on three counts of especially aggravated kidnapping of all three victims, and one count of especially aggravated robbery of Marcellos Anderson. The Petitioner and Montgomery were jointly tried and convicted as charged. The Petitioner was sentenced to death for the three murder convictions and sentenced to forty-year sentences for each of the other offenses.

## A. Trial and Procedural History

The Petitioner appealed his convictions and sentence, and this court affirmed. *State v. Carruthers*, No. W1997-00097-CCA-R3-CD, 1999 WL 1530153, at *61 (Tenn. Crim. App. Dec. 21, 1999). On automatic review, our supreme court summarized the facts presented at trial as follows:

> Marcellos Anderson, was heavily involved in the drug trade, along with two other men, Andre "Baby Brother" Johnson and Terrell Adair. Anderson wore expensive jewelry, including a large diamond ring, carried large sums of money on his person, and kept a considerable amount of cash in the attic of the home of his mother, victim Delois Anderson. When his body was discovered, Anderson was not wearing any jewelry and did not have any cash on his person. Anderson was acquainted with both defendants, and he considered [the Petitioner] to be a trustworthy friend. The proof showed that Anderson's trust was misplaced.
>
> In the summer of 1993 Jimmy Lee Maze, Jr., a convicted felon, received two letters from [the Petitioner], who was then in prison on an unrelated conviction. In the letters, [the Petitioner] referred to "a master plan" that was "a winner." [The Petitioner] wrote of his intention to "make those streets pay me" and announced, "everything I do from now on will be well organized and extremely violent." Later, in the fall of 1993, while incarcerated at the Mark Luttrell Reception Center in Memphis awaiting his release, [the Petitioner] was assigned to a work detail at a local cemetery, the West Tennessee Veterans' Cemetery. At one point, as he helped bury a body, [the Petitioner] remarked to fellow inmate Charles Ray Smith "that would be

---

[1] Prior to trial, Jonathan Montgomery was found hanged in his jail cell.

- 2 -

a good way, you know, to bury somebody, if you're going to kill them. . . .
[I]f you ain't got no body, you don't have a case."

Smith also testified that he overheard [the Petitioner] and
Montgomery, who also was incarcerated at the Reception Center, talking
about Marcellos Anderson after Anderson had driven [the Petitioner] back to
the Reception Center from a furlough. According to Smith, when
Montgomery asked [the Petitioner] about Anderson, [the Petitioner] told him
that both Anderson and "Baby Brother" Johnson dealt drugs and had a lot of
money. [The Petitioner] said he and Montgomery could "rob" and "get"
Anderson and Johnson once they were released from prison.

When [the Petitioner] was released from the Department of Correction
on November 15, 1993, he left the Reception Center with Anderson. [The
Petitioner] accompanied Anderson to Andre Johnson's house, and received
a gift of $200 cash from Anderson, Johnson, and Terrell Adair, who was
present at Johnson's house.

One month later, on December 15, 1993, Smith was released from the
Department of Correction. Upon his release, Smith warned Anderson and
Johnson of [the Petitioner's] and Montgomery's plans to "get them."
According to Smith and Johnson, Anderson did not take the warning or the
defendants' threats seriously.

In mid-December 1993, Maze, his brother and [the Petitioner] were
riding around Memphis together. They came upon Terrell Adair's red Jeep
on the street in front of Delois Anderson's home where a drive-by shooting
had just occurred. Adair had been injured in the shooting and was in the
hospital. Jonathan "Lulu" Montgomery, James Montgomery's brother, was
at the scene of the shooting, and he joined [the Petitioner] in the back seat of
Maze's car. According to Maze, [the Petitioner] remarked to Jonathan that,
"it would be the best time to kidnap Marcellos," and Jonathan asked, "which
one Baby Brother or Marcellos?" [The Petitioner] then nudged Montgomery
with his elbow and said "it" was going to take place after James Montgomery
was released from prison. About two weeks later, on December 31, Maze
saw [the Petitioner] loading three antifreeze containers into a car, and [the
Petitioner] indicated to Maze that the containers were filled with gasoline.

On January 11, 1994, James Montgomery was released from prison.
After his release, Montgomery told "Baby Brother" Johnson that he, not
Johnson, was in charge of the neighborhood. Montgomery said, "It was my

- 3 -

neighborhood before I left, and now I'm back and its my neighborhood again." Montgomery asked Johnson if he wanted to "go to war about this neighborhood." When Johnson said, "no," Montgomery replied "You feeling now like I'm about to blow your motherf——g brains out" and "you all need to get in line around here or we're going to war about this." Near the end of January or the first of February 1994, Johnson and Adair saw the defendants sitting together in an older model grey car down the street from Johnson's mother's home. It was late at night, between 11 p.m. and 1 a.m. When the defendants approached Johnson and Adair, Montgomery asked why they thought he was trying to harm them. Montgomery told them, "Look, I told you, we ain't got no problem with nobody in this neighborhood. We already got our man staked out. If we wanted some trouble or something, we got you right now. We'd kill your whole family." Confirming Montgomery's statement, [the Petitioner] told them, "We already got our man staked out. You all right. If it's any problem, we'll deal with it later." Montgomery explained that he intended to take the "man's" money and drugs, and said, "if the police didn't have no body, they wouldn't have no case."

On February 23, 1994, Marcellos Anderson borrowed a white Jeep Cherokee from his cousin, Michael Harris. Around 4:30 on the afternoon of February 24, 1994, witnesses saw Marcellos Anderson and Frederick Tucker riding in the Jeep Cherokee along with James and Jonathan Montgomery. About 5 p.m. that day, James and Jonathan Montgomery and Anderson and Tucker arrived in the Jeep Cherokee at the house of Nakeita Shaw, the Montgomery brothers' cousin. Nakeita Shaw, her four children, and Benton West, also her cousin, were present at the house when they arrived.

The four men entered the house and went downstairs to the basement. A short time later, James Montgomery came back upstairs and asked Nakeita Shaw if she could leave for a while so he could "take care of some business." Nakeita Shaw told West that she thought "they" were being kidnapped, and then she left the house with West and her children. West agreed to care for Nakeita Shaw's children while she attended a meeting.

When Nakeita Shaw returned home after the meeting, she saw only [the Petitioner] and James Montgomery. Montgomery asked her to go pick up her children and to "stay gone a little longer." Nakeita Shaw returned home with her children before 10 p.m. The Jeep Cherokee was gone, but James Montgomery and [the Petitioner] were still present at her home. Montgomery told Nakeita Shaw to put her children to bed upstairs and

remain there until he told her he was leaving. Sometime later, Montgomery called out to Nakeita Shaw that he was leaving. She returned downstairs and saw James Montgomery, [the Petitioner], and the two victims, Anderson and Tucker, leave in the Jeep Cherokee. Prior to trial, Nakeita Shaw told the police that Anderson's and Tucker's hands were tied behind their backs when they left her house. While she admitted making this statement, she testified at trial that the statement was false and that she had not seen Anderson's and Tucker's hands tied when they left her home.

In the meantime, around 8 p.m. on February 24, Laventhia Briggs telephoned her aunt, victim Delois Anderson. When someone picked up the telephone but said nothing, Briggs hung up. Briggs called "a couple of more times" but received no answer. Briggs was living with Delois Anderson at the time and arrived at her aunt's home around 9:00 p.m. Although Delois Anderson was not home, her purse, car, and keys were there. Food left in Anderson's bedroom indicated that she had been interrupted while eating. Briggs went to bed, assuming her aunt would return home soon. A co-worker, whom Delois Anderson had driven home around 7:15 p.m., was the last person to have seen her alive.

Chris Hines, who had known the defendants since junior high school, testified that around 8:45 p.m. on February 24, 1994, Jonathan Montgomery "beeped" him. Jonathan said, "Man, a n——r got them folks." When Hines asked, "What folks?" Jonathan replied, "Cello and them" and said something about stealing $200,000. Jonathan then indicated that he could not talk more on the telephone and arranged to meet Hines in person. Jonathan arrived at Hines' home at about 9:00 p.m. and told him, "Man, we got them folks out at the cemetery on Elvis Presley, and we got $200,000. Man, a n——r had to kill them folks." At that point, James Montgomery "beeped in" and talked with Jonathan. When the telephone call ended, Jonathan asked Hines to drive him to the cemetery. Hines refused, but he allowed Jonathan to borrow his car, which Jonathan promised to return in an hour. When the car was not returned, Hines called James Montgomery's cellular telephone at around 11 p.m. James told Hines that he did not know where Jonathan was, that Jonathan did not have a driver's license, and that the car should be returned by 4 a.m. because Jonathan was supposed to drive James to his girlfriend's house.

The Jeep Cherokee that Anderson had borrowed was found in Mississippi on February 25 around 2:40 a.m. It had been destroyed by fire. About 3:30 a.m., after he was informed of the vehicle fire by law enforcement

officials, Harris telephoned Delois Anderson's home, and Laventhia Briggs then discovered that neither her aunt Delois nor her cousin Marcellos had returned home. Briggs filed a missing person report with the police later that day.

The Montgomery brothers and [the Petitioner] did not return Hines' car until approximately 8:30 a.m. on February 25. The car was very muddy. Hines drove James Montgomery and [the Petitioner] to Montgomery's mother's home and then drove away with Jonathan Montgomery. That morning Jonathan, whom Hines described as acting "paranoid" and "nervous," repeatedly told Hines that "they had to kill some people." About two hours later, James Montgomery and [the Petitioner] came to Hines' home looking for Jonathan. Hines advised [the Petitioner] and James Montgomery that he was celebrating his birthday, and he asked James Montgomery to give him a birthday present. James agreed to give Hines twenty dollars after he picked up his paycheck, and James also agreed to have Hines' car washed immediately as a birthday present.

Hines, the Montgomery brothers, and [the Petitioner] drove to a carwash, and James Montgomery paid an unidentified elderly man to clean the car. The man cleaned the interior of the car and the trunk of the car. Neither [the Petitioner] nor James Montgomery supervised the cleaning of the car. After Jonathan Montgomery abruptly left the carwash, [the Petitioner] and James Montgomery asked Hines what Jonathan had told him, but Hines did not tell them. Several days later James Montgomery came to Hines' home and offered Hines an AK-47 assault rifle because Montgomery said he had "heard that Hines was into it with some people on the street." James Montgomery told Hines the rifle had "blood on it." Hines testified that he interpreted this statement to mean that someone had been shot with the weapon.

On March 3, 1994, about one week after a missing person report was filed on Delois and Marcellos Anderson, Jonathan Montgomery directed Detective Jack Ruby of the Memphis Police Department to the grave of Dorothy Daniels at the Rose Hill Cemetery on Elvis Presley Boulevard. Daniels' grave was located six plots away from the grave site of the Montgomery brothers' cousin. Daniels had been buried on February 25, 1994. Pursuant to a court order, Daniels' casket was disinterred, and the authorities discovered the bodies of the three victims buried beneath the casket under several inches of dirt and a single piece of plywood.

An employee of the cemetery testified that a pressed wood box or vault had been placed in Daniels' grave during working hours on February 24 and that it would have taken at least two people to remove the box. Daniels' casket had been placed in the grave inside the box on February 25, and, according to Dr. Hugh Edward Berryman, one of the forensic anthropologists who assisted in the removal of the bodies from the crime scene, there was no evidence to suggest that Daniels' casket had been disturbed after she was buried. Thus, it can be inferred that the bodies of the three victims were placed in the grave and covered with dirt and a piece of plywood prior to the casket being placed in the grave.

Dr. O.C. Smith, who helped remove the bodies from the grave and who performed autopsies on the victims, testified that, when found, the body of Delois Anderson was lying at the bottom of the grave and the bodies of the two male victims were lying on top of her. The hands of all three victims were bound behind their backs. Frederick Tucker's feet were also bound and his neck showed signs of bruising caused by a ligature. A red sock was found around Delois Anderson's neck. Marcellos Anderson was not wearing any jewelry. Dr. Smith testified that Delois Anderson died from asphyxia caused by several factors: the position of her head against her body, dirt in her mouth and nose, and trauma from weight on her body. Frederick Tucker had received a gunshot wound to his chest, which would not have been fatal had he received medical care. He had also suffered injuries from blunt trauma to his abdomen and head resulting in broken ribs, a fractured skull, and a ruptured liver. Dr. Smith opined that Tucker was shot and placed in the grave, where the force of compression from being buried produced the other injuries and, along with the gunshot wound, caused his death. According to Dr. Smith, Marcellos Anderson had been shot three times: a contact wound to his forehead that was not severe and two shots to his neck, one of which was also not serious. However, the gunshot causing the other neck wound had entered Anderson's windpipe and severed his spinal cord, paralyzing him from the neck down. This wound was not instantaneously fatal. Anderson had also suffered blunt trauma to his abdomen from compression forces. Dr. Smith opined that each victim was alive when buried.

Defendant James Montgomery presented no proof. [The Petitioner], acting pro se, called several witnesses to rebut the testimony offered by the State, primarily by attacking the credibility of the State's witnesses.

A health administrator at the Mark Luttrell Reception Center testified that, because of an injury to his arm, [the Petitioner] had been given a job

change on October 6, 1993, and had not worked at the cemetery after that date. Another official at the Reception Center testified that [the Petitioner] was not released on furlough after Montgomery arrived at the Reception Center on November 4, 1994. This proof was offered to impeach Smith's testimony that Montgomery and [the Petitioner] discussed robbing and getting Marcellos Anderson after Anderson drove [the Petitioner] back to the Reception Center following a furlough. An investigator appointed to assist [the Petitioner] with his defense testified that he had interviewed Maze, who admitted he did not know anything about the "master plan" to which [the Petitioner] referred in the letters until Carruthers was released from prison. On cross-examination, the investigator admitted that Maze said that when he was released from prison, [the Petitioner] had explained that the master plan involved kidnapping Marcellos Anderson. [The Petitioner's] brother and another witness testified that Jonathan Montgomery was not at the scene of the drive-by shooting involving Terrell Adair. This proof was offered to impeach Maze's testimony that [the Petitioner] and Jonathan Montgomery discussed kidnapping Marcellos on the day that Terrell Adair was shot. Another witness, Aldolpho Antonio James, testified that he and [the Petitioner] had been visiting a friend between the hours of 1:00 a.m. and 2:00 a.m. the day before these homicides were first reported on the news. This testimony was offered to provide at least a partial alibi for [the Petitioner] for the early morning hours of February 25, 1994. However, on cross-examination, James admitted that he did not know the exact date he and [the Petitioner] had been together.

[The Petitioner] also called Alfredo Shaw as a witness. After seeing a television news report about these killings in March of 1994, Alfredo Shaw had telephoned CrimeStoppers and given a statement to the police implicating [the Petitioner]. Alfredo Shaw later testified before the grand jury which eventually returned the indictments against [the Petitioner] and Montgomery. Prior to trial, however, several press reports indicated that Alfredo Shaw had recanted his grand jury testimony, professed that the statement had been fabricated, and intended to formally recant his grand jury testimony when called as a witness for the defense. Therefore, when [the Petitioner] called Alfredo Shaw to testify, the prosecution announced that if he took the stand and recanted his prior sworn testimony, he would be charged with and prosecuted for two counts of aggravated perjury. In light of the prosecution's announcement, the trial court summoned Alfredo Shaw's attorney and allowed Alfredo Shaw to confer privately with him. Following that private conference, Alfredo Shaw's attorney advised the trial court, defense counsel, including [the Petitioner], and the prosecution, that

Alfredo Shaw intended to testify consistently with his prior statements and grand jury testimony and that any inconsistent statements Alfredo Shaw had made to the press were motivated by his fear of [the Petitioner] and by threats he had received from him.

Despite this information, [the Petitioner] called Alfredo Shaw as a witness and as his attorney advised, Shaw provided testimony consistent with his initial statement to the police and his grand jury testimony. Specifically, Alfredo Shaw testified that he had been on a three-way call with [the Petitioner] and either Terry or Jerry Durham, and during this call, [the Petitioner] had asked him to participate in these murders, saying he had a "sweet plan" and that they would each earn $100,000 and a kilogram of cocaine. Following his arrest for these murders, [the Petitioner] was incarcerated in the Shelby County Jail along with Alfredo Shaw, who was incarcerated on unrelated charges. [The Petitioner] and Alfredo Shaw were in the law library when [the Petitioner] told Alfredo Shaw that he and some other unidentified individuals went to Delois Anderson's house looking for Marcellos Anderson and his money. Marcellos was not there when they arrived, but [the Petitioner] told Delois Anderson to call her son and tell him to come home, "it's something important." When Anderson arrived, the defendants forced Anderson, Tucker, who was with Anderson, and Delois Anderson into the jeep at gunpoint and drove them to Mississippi, where the defendants shot Marcellos Anderson and Tucker and burned the jeep. According to Alfredo Shaw, the defendants then drove all three victims back to Memphis in a stolen vehicle. Alfredo Shaw testified that, after they put Marcellos Anderson and Tucker into the grave, Delois Anderson started screaming and one of the defendants told her to "shut up" or she would die like her son and pushed her into the grave. [The Petitioner] also told Alfredo Shaw that the bodies would never have been discovered if "the boy wouldn't have went and told them folks." [The Petitioner] told Alfredo Shaw that he was not going to hire an attorney or post bond because the prosecution would then learn that the murders had been a "hit." [The Petitioner] told Alfredo Shaw that Johnson also was supposed to have been "hit" and that Terry and Jerry Durham were the "main people behind having these individuals killed." [The Petitioner] said that the Durhams wanted revenge because Anderson and Johnson had previously stolen from them.

In response to questioning by [the Petitioner], Alfredo Shaw acknowledged that he had told the press that his statement to police and his grand jury testimony had been fabricated, but said he had done so because [the Petitioner] had threatened him and his family. According to Alfredo

Shaw, one of [the Petitioner's] investigators had arranged for a news reporter to speak with him about recanting his grand jury testimony.

As impeachment of his own witness, [the Petitioner] called both Jerry and Terry Durham, twin brothers, as witnesses. The Durhams denied knowing Alfredo Shaw and said they had never been party to a three-way telephone call involving Alfredo Shaw and [the Petitioner]. [The Petitioner] also called attorney AC Wharton who testified that he was initially retained by [the Petitioner's] mother to represent her son on these murder charges, but was required to withdraw because of a conflict of interest. This testimony was offered to impeach Alfredo Shaw's statement that [the Petitioner] had said he was not going to hire an attorney or post bond. Finally, [the Petitioner] called an administrative assistant from the Shelby County jail who testified that jail records, indicated that Alfredo Shaw was not in the law library at the same time as [the Petitioner] in either February or March of 1994. According to jail records, Alfredo Shaw was in protective custody for much of that time and, as a result, would have been escorted at all times by a guard. However, on cross-examination, this witness admitted that the jail records regarding the law library were not always complete or accurate and that Alfredo Shaw had been housed outside of protective custody from mid-March to early April 1994 which would have afforded him the opportunity to interact with [the Petitioner]. The record reflects that Alfredo Shaw came forward and provided a statement to police on March 27, 1994 and that the indictments were returned on March 29, 1994.

Based upon this proof, the jury found each defendant guilty beyond a reasonable doubt of three counts of first degree murder, three counts of especially aggravated kidnapping, and one count of especially aggravated robbery.

*State v. Carruthers*, 35 S.W.3d 516, 524 (Tenn. 2000), *cert. denied*, 533 U.S. 953 (2001). Our supreme court affirmed the Petitioner's judgments and sentences.[2] *Id.* at 572.

After unsuccessfully attempting other avenues of relief, on September 21, 2021, the Petitioner filed a petition requesting comparison of prints taken from Ms. Anderson's home with known latent prints of Ronnie Irving. It appears that James Montgomery, in 2010 or 2011, alleged to a defense investigator that Ronnie Irving was the "kidnap man" involved in these crimes. The Petitioner argued that he would not have been prosecuted, convicted,

---

[2]The supreme court reversed the Petitioner's co-defendant, James Montgomery's convictions based upon an issue with severance and remanded for a new trial.

or sentenced to death if the prints from Ms. Anderson's home had matched Mr. Irving's known prints. The post-conviction court summarily dismissed the petition, concluding that the Petitioner was not entitled to mandatory or discretionary testing. It is from this judgment that the Petitioner appeals.

## II. Analysis

On appeal, the Petitioner contends that the post-conviction court erred when it summarily dismissed his petition for post-conviction relief pursuant to the Fingerprint Analysis Act. The Petitioner also argues that the trial court should have, pursuant to the Fingerprint Analysis Act, considered evidence that one of the State's witnesses, Alfredo Shaw, was a paid informant. The State counters that the trial court properly denied the petition because the Petitioner failed to support his allegations in his petition. We agree with the State.

The Fingerprint Analysis Act provides that a petitioner convicted of certain enumerated offenses, including first-degree murder, may, at any time, file a petition requesting the performance of fingerprint analysis of any evidence that is in the possession or control of the prosecution, law enforcement, laboratory, or court, and that is related to the investigation or prosecution that resulted in a judgment of conviction and that may contain fingerprint evidence. T.C.A. § 40-30-403 (2021). Depending on the situation, and after notice to the prosecution and an opportunity to respond, the trial court shall or may order the requested fingerprint analysis. *Compare* T.C.A. § 40-30-404(1) (2021) (the court *shall* order analysis if "[a] reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through fingerprint analysis") with T.C.A. § 40-30-405(1) (the court *may* order analysis if "[a] reasonable probability exists that analysis of the evidence will produce fingerprint results that would have rendered the petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction"). Both sections 404 (mandatory analysis) and 405 (permissive analysis) require that the evidence is still available and in such a condition susceptible to analysis, that it has not already been subjected to the type of analysis being sought by the petition, and that the petition is not being made to unreasonably delay execution of the sentence. T.C.A. §§ 40-30-404(2) to (4) and 405(2) to (4).

In *Smith v. State*, No. M2021-01339-CCA-R3-PD, 2022 WL 854438 (Tenn. Crim. App. Mar. 23, 2022), this court determined that case law discussing the Post-Conviction DNA Analysis Act of 2001 ("DNA Act") was helpful for guidance in ruling on petitions under the Fingerprint Analysis Act because the language of the Fingerprint Analysis Act mirrored that of the DNA Act and the appellate courts "have had ample opportunity over the last twenty years or so to interpret the meaning of the DNA Act." 2022 WL 854438,

at *13. Accordingly, a trial court is not required to hold a hearing to determine whether a petition for fingerprint analysis should be granted or denied. *Id*. (citing *Elsea v. State*, No. E2017-01676-CCA-R3-PC, 2018 WL 2363589 at *3 (Tenn. Crim. App. May 24, 2018)). The post-conviction court's determination of whether to grant a petition for post-conviction fingerprint analysis is reviewed for an abuse of discretion. *Id*. at *14.

As previously noted, after notice to the prosecution and an opportunity to respond, the court shall order fingerprint analysis under certain circumstances. T.C.A. § 40-30-404.

> (1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through fingerprint analysis;
>
> (2) The evidence is still in existence and in such a condition that fingerprint analysis may be conducted;
>
> (3) The evidence was never previously subjected to fingerprint analysis, was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis, or was previously subjected to analysis and the person making the motion under this part requests analysis that uses a new method or technology that is substantially more probative than the prior analysis; and
>
> (4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

*Id*. at § 40-30-404; *cf.* T.C.A. § 40-30-405. A petitioner must satisfy all four elements of section 404 or section 405 before the trial court will order fingerprint analysis. *Smith*, 2022 WL 854438, at *13; *see Powers v. State*, 343 S.W.3d 36, 48 (Tenn. 2011). In this case, the Petitioner requested fingerprint analysis of palm prints found in the murder victim's home.

In this case, the post-conviction court found:

> Petitioner has requested the Court to order the State to compare the fingerprint cards of the prints lifted at the residence of Mrs. Anderson with the known fingerprints of Ronnie Irving. . . .[3] Based upon what has been

---

[3] In his petition, the Petitioner also wanted comparison of prints taken from a 1991 red Chevy. Because he does not maintain this request on appeal, we removed reference to the Chevy from the court's order to focus on the issue the Petitioner has maintained on appeal.

presented to the Court regarding the petition, it appears that the allegation regarding Ronnie Irving being involved in this case first came to light in 2010 when the defense interviewed James Montgomery. Even assuming arguendo that Mr. Irving's fingerprints had been located in Mrs. Anderson's residence . . . prior to the indictment and/or trial of this case, such evidence would not have prevented the prosecution and conviction of Mr. Carruthers and the [P]etitioner's verdict or sentence would not have been more favorable.

The Court does not find that a reasonable probability exists that the [P]etitioner would not have been prosecuted or convicted if the hoped-for results are, obtained through the requested fingerprint analysis or that a reasonable probability exists that analysis of the evidence will produce fingerprint results that would have rendered the [P]etitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction. The Court makes these findings for three reasons.

First, even if Mr. Irving's fingerprints had been found in Mrs. Anderson's residence . . . prior to the indictment and/or trial and/or sentencing in this case, there was no proof explaining the relevance of the fingerprints at that time. The alleged connection of Mr. Irving to this case was not known until 2010, more than a decade after the indictment, conviction, and sentencing of [the Petitioner] in this case. Without a known connection prior to the indictment and/or trial and/or sentencing in this case, there is no reasonable probability that the [P]etitioner would not have been prosecuted or convicted if exculpatory results had been obtained through fingerprint analysis and no reasonable probability that the fingerprint results would have rendered the [P]etitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction.

Second, even if there had been proof that Mr. Irving was involved, that fact would not have eliminated the possibility that [the Petitioner] was involved.

Third, there was overwhelming evidence, as noted by the State in this case, that [the Petitioner] was involved in this case.

Regarding prong two, which is the same in both statutes, the Court believes there is ample evidence to show that the prints located in Mrs. Anderson's residence are still in existence and in such a condition that

fingerprint analysis may be conducted. The Court bases this finding on the representation that the prints were run through the AFIS system in 2022 and likely still exist. . . .

Regarding prong three, which is similar in both statutes, the Court finds the fingerprints of Ronnie Irving were not previously subjected to fingerprint analysis and were not subjected to the analysis that is being requested which could resolve an issue not resolved by previous analysis. However, the Court does not find that the fingerprints were previously subjected to analysis and the person making the motion under this part requests analysis that uses a new method or technology that is substantially more probative than the prior analysis.

Following this review, the post-conviction court concluded that the Petitioner had not met all four "prongs" as required by statute and dismissed the petition.

The evidence in the record supports the trial court's conclusion that the Petitioner failed to show that the Petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through fingerprint analysis or that he would have gotten more favorable results if the results had been available before trial and sentencing. At best, any alleged exculpatory information would have led to a possible fourth participant in these crimes. Even if the analysis revealed exactly what the Petitioner asserts, it would not have undermined the significant evidence against him unrelated to those fingerprints. The State's evidence at trial showed that the Petitioner planned out these crimes months before and revealed those plans to others. His statements to others indicated anticipation of Mr. Anderson's murder and even the specific method he planned to use to conceal the murders – burial in a cemetery. His co-defendant, Jonathan Montgomery, took the police to the exact location where the bodies were buried. While in jail after his arrest for the murders, the Petitioner confessed specific details of these crimes to another inmate. Further, he claimed the victims' bodies would not have been found had Jonathan Montgomery not informed the police. Thus, the Petitioner has failed to meet all four prongs of either Tennessee Code Annotated section 40-35-404 (mandatory) or section 40-30-405 (permissive).

The Petitioner also asks this court to reweigh the credibility of a State witness in light of his involvement as a confidential informant for the State. The post-conviction court made the following findings as to this issue:

Finally, the credibility of Mr. Shaw and/or the discovery that he was a paid informant is irrelevant to the petition pending before the Court. Such

evidence has no bearing on the analysis required under Tenn. Code Ann. § 40-30-404 and Tenn. Code. Ann. § 40-30-405.

The Fingerprint Analysis Act provides for fingerprint analysis. It is not an avenue for relief for allegations of newly discovered evidence unrelated to fingerprint analysis. The Petitioner argues, however, that since the purpose of the Fingerprints Analysis Act is to exonerate those wrongfully convicted, we should consider this issue nonetheless. We decline to expand the role of the Fingerprint Analysis Act to encompass all claims of innocence. Therefore, the trial court did not abuse its discretion when it declined to consider the credibility of a paid informant pursuant to the Fingerprint Analysis Act.

Accordingly, because the Petitioner failed to satisfy all four elements of section 404 or section 405, the trial court did not abuse its discretion when it summarily dismissed his petition. The Petitioner is not entitled to relief.

## III. Conclusion

Based on the foregoing reasoning and authorities, we affirm the post-conviction court's judgment.

_____s/ *ROBERT W. WEDEMEYER*_____
ROBERT W. WEDEMEYER, PRESIDING JUDGE

- 15 -